PLANNED PARENTHOOD ASSOCIATION OF KANSAS CITY, MISSOURI, INC., Naim S. Kassar, M.D., Reproductive Health Services, Allen S. Palmer, D.O., Appellees,

v.

John ASHCROFT, Attorney General of State of Missouri, Ralph L. Martin, Prosecuting Attorney of Jackson County, Missouri, Appellants.

PLANNED PARENTHOOD ASSOCIATION OF KANSAS CITY, MISSOURI, INC., Naim S. Kassar, M.D., Reproductive Health Services, Allen S. Palmer, D.O., Appellants,

v.

John ASHCROFT, Attorney General of State of Missouri, Ralph L. Martin, Prosecuting Attorney of Jackson County, Missouri, Appellees.

Nos. 80–1130, 80–1530.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 17, 1980.

Decided July 8, 1981.

John Ashcroft, Atty. Gen., J. Michael Davis, Asst. Atty. Gen. (argued), Jefferson City, Mo., for appellants/cross-appellees.

Frank Susman, Susman, Schermer, Rimmel & Parker, St. Louis, Mo., for appellees/cross-appellants.

Eve W. Paul, Dara Klassel, Planned Parenthood Federation of America, Inc., New York City, for amici curiae.

Before LAY, Chief Judge, HENLEY, Circuit Judge, and HARRIS,* Senior Judge.

LAY, Chief Judge.

This is an appeal and cross-appeal relating to the constitutionality of the Missouri statutes regulating abortion.[1] The trial court denied injunctive relief, but issued a declaratory judgment holding all or part of five sections of the Missouri statutes unconstitutional.

Allen S. Palmer, D.O., and Naim S. Kassar, M.D., licensed physicians, and Planned Parenthood and Reproductive Health Services, corporations that operate abortion clinics in Kansas City and St. Louis,[2] brought suit against John Ashcroft, Attorney General of Missouri, and Ralph Martin, prosecuting attorney of Jackson County, Missouri (in his capacity as Jackson County prosecutor and as representative of the class of Missouri prosecutors).[3]

On appeal the Missouri defendants challenge the district court holding on the unconstitutionality of a provision requiring second trimester abortions to be performed in a hospital, parental or judicial consent requirements for minors, restrictions on abortion of viable fetuses, and "informed consent" requirements. They also challenge the award of attorneys' fees. Planned Parenthood cross-appeals from the district court's refusal to declare unconstitutional provisions requiring: (1) that the "informed consent" information must be given by the attending physician; (2) submission of tissue samples from all abortions to a pathologist; and (3) completion of individual reports on women seeking post-abortion care.[4]

We affirm in part, reverse in part and remand for further proceedings.

In summary, we first find that the district court erred in concluding on the present record that the State's requirement that all second trimester abortions be performed in a hospital is unconstitutional. We find that the fact that hospitals alleged-

---

* Oren Harris, Senior District Judge, Eastern and Western Districts of Arkansas, sitting by designation.

1. The district court's opinion is published at 483 F.Supp. 679.

2. In order to simplify discussion plaintiffs are hereinafter referred to collectively as "Planned Parenthood".

3. In order to simplify discussion defendants are hereinafter referred to as "Missouri".

4. On June 30, 1979, the district court issued a temporary restraining order to prevent enforcement of the challenged statutes. This order was modified on September 27, 1979. At the conclusion of the trial, the defendants gave assurances that portions of the Act declared unconstitutional would not be enforced. 483 F.Supp. at 701.

The district court also dealt with other provisions of the Missouri statutes, but its conclusions on those questions are not challenged on appeal.

ly require parental consent for the admission of minors is not an unconstitutional burden imposed by the State. We nonetheless remand this issue to the district court for further findings as to whether the hospitalization requirement is a substantial burden on women patients seeking abortions in the second trimester (at least up to 18 weeks) and if so whether the State has shown a compelling state interest which justifies the requirement.

We reverse the district court's finding that section 188.030 of the Missouri statutes imposes strict criminal liability on doctors who may abort viable fetuses. We find the Missouri law requires scienter (knowledge) by the physician such that it comports with constitutional requirements. We also reverse the district court's holding that subsection 188.030.2 is unconstitutionally vague.

We likewise find the district court erred in holding the provisions relating to parental or judicial consent for a minor's abortion unconstitutional. We think proper interpretation of the judicial consent provision requires a court to grant judicial consent to a mature minor or a minor for whom an abortion is in her best interests. We find, however, that the provision requiring notice to the parents of all minors is unconstitutional because it requires notice to the parents of minors who are mature or minors for whom it is not in their best interest to give notice. We find the remaining portion of section 188.028 constitutional.

We affirm the district court's finding that the requirement of a second doctor during a second trimester abortion is unconstitutional. We likewise affirm its finding that the 48 hour waiting period is unconstitutional. We also agree with the district court that the informed consent provision requiring notice to parents and the provi-

sions for informed consent under subsections 188.039.2(1), (2), (3), and (4) are unconstitutional. We uphold the district court's findings that the State may require the attending physician to inform the woman as to the particular medical risks associated with the abortion technique to be used and the available alternatives.

Finally, we agree with the district court there is nothing impermissible in the abortion complication reports required by the State. We find section 188.047, requiring pathology reports following all abortions to be an impermissible requirement. We vacate and remand to the district court for reconsideration the constitutionality of the abortion complication reports required under section 188.052.2.

We affirm the district court's award of attorney fees.

I. *Second Trimester Hospitalization Requirement.*

Section 188.025 [5] requires that second and third trimester abortions be performed in a hospital. The district court held that this requirement did not reasonably relate to protection of maternal health, because the dilatation and evacuation method (D&E) could be performed safely outside of a hospital up until the 18th week. The court observed that the effect of the hospitalization requirement was to make a second trimester D&E unavailable in Missouri because only one hospital in the state allows D&E in the second trimester. Alternatively, the court held that this requirement granted parents the power to veto a minor woman's decision to have an abortion contrary to *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), because no hospital in Missouri would admit a woman under 18 without parental consent. 483 F.Supp. at 685–87.[6]

---

**5.** Section 188.025 states:

Every abortion performed subsequent to the first twelve weeks of pregnancy shall be performed in a hospital.

Mo.Ann.Stat. § 188.025 (Vernon).

**6.** Several district courts have recently considered similar challenges to second trimester

hospitalization requirements. *See Wolfe v. Stumbo*, No. C 80–0285 L(A) (W.D.Ky. Dec. 3, 1980) (unconstitutional); *Gary-Northwest Indiana Women's Services v. Bowen*, 496 F.Supp. 894 (N.D.Ind.1980), *aff'd sub nom. Gary-Northwest Indiana Women's Services v. Orr*, —— U.S. ——, 101 S.Ct. 2012, 68 L.Ed.2d 321 (1981) (constitutional); *Margaret S. v. Ed-*

### A. Parental Consent for Hospitalization.

We first address the finding made by the district court that since all hospitals in Missouri require parental consent for abortion to minors the effect of a statute requiring hospitalization is to grant parents the absolute veto forbidden by *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). We must respectfully disagree.

The district court's holding goes a step beyond *Danforth*. In *Danforth*, the *state* required parental consent as a prerequisite for a minor to have an abortion, thus directly interfering with the woman's decision. The present Missouri hospitalization requirement says nothing about parental consent and the State itself has not given parents a veto power.[7] Instead, the State has imposed second trimester regulations that it claims are within the State's regulatory power in the second trimester because they are reasonably related to the woman's health. *Roe v. Wade*, 410 U.S. 113, 164, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973). The district court's holding would mean that the State could not impose such regulations if they created a situation in which the acts of private entities could interfere with the woman's decision. The problem with this approach to the *Roe* rule is that it would force reevaluation of every health-based second trimester regulation to determine its practical effect, without concern for its health-based justification. For example, Missouri requires that all abortions be performed by a physician. Private physicians may choose not to perform abortions. If statistics showed that no physicians in the state or in some geographic area of the state were willing to perform second trimester abortions on minors without parental consent, the district court's logic would declare the physician requirement unconstitutional.

■■■■ The point is that when dealing with second trimester regulations, *Roe* declares that the *sole* question is whether the regulation reasonably relates to the woman's health.[8] If the regulation bears a reasonable relation to health, the regulation may and probably will restrict the woman's options. It may also put some private parties in a position where they may impose regulations or costs that restrict the options of some women. But if the statute is reasonably related to health, the fact that private entities (i. e., the hospitals) impose additional requirements without the State's sanction or insistence cannot affect the statute's constitutionality.[9] We reject the

---

*wards*, 488 F.Supp. 181 (E.D.La.1980) (unconstitutional). *See also Wynn v. Scott*, 449 F.Supp. 1302, 1318 (N.D.Ill.1978), *aff'd sub nom. Wynn v. Carey*, 599 F.2d 193 (7th Cir. 1979) (hospitalization requirement constitutional; no discussion of D&E method); *Hodgson v. Lawson*, 542 F.2d 1350, 1354 (8th Cir. 1976) ("The requirement . . . that an abortion be performed in a hospital, which is not challenged here, is an example of permissible state regulation subsequent to the first trimester.").

7. Missouri also argues that the testimony at trial failed to show that *no* hospitals in the state will admit minors for abortion without parental consent. There was no testimony from any person claiming knowledge of the policies of hospitals throughout the state that no hospital would admit a minor without parental consent. Missouri likewise urges that the record demonstrates that many abortions are performed by physicians on an outpatient basis without direct admission to the hospital.

8. As *Danforth* indicates, the practical availability of safe alternatives is a consideration in

determining the rationality of a prohibition on particular methods. Where the state has forbidden a relatively safe method on the rationale that equally safe or safer methods are available, the court must consider the actual availability of these alternatives. Practical obstacles, such as a consent requirement, may enter into this evaluation. However, the inquiry remains whether the regulation is one reasonably related to the woman's health.

9. "Our cases state 'that a State is responsible for the . . . act of a private party when the State, by its law, has compelled the act.' *Adickes [v. S.H. Kress & Co.,]* 398 U.S. [144,] 170, [90 S.Ct. 1598, 1615, 26 L.Ed.2d 142] [(1970)]. This Court, however, has never held that a State's mere acquiescence in a private action converts that action into that of the State." *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164, 98 S.Ct. 1729, 1737, 56 L.Ed.2d 185 (1978).

If it is true that no hospitals in Missouri will admit minor women without parental consent, and we agree the evidence is not convincing in this respect, the plaintiffs may wish to direct

district court's alternative ground for finding section 188.025 unconstitutional.

## B. Effect on Availability of Second Trimester Abortions.

The district court held that the hospitalization requirement unconstitutionally restricted the availability of second trimester abortions. We conclude that it is not clear that the district court applied the proper legal standard or that the factual findings underlying this holding are adequate. A remand for further proceedings is necessary to provide us with an adequate basis for review of the constitutionality of the hospitalization requirement.

In 1973 *Roe v. Wade* addressed whether a second trimester hospitalization requirement is a permissible regulation:

> Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, *whether it must be a hospital or may be a clinic or some other place of less-than-hospital status*; as to the licensing of the facility; and the like.

410 U.S. at 163, 93 S.Ct. at 732 (emphasis added).

*See also Gary-Northwest Indiana Women's Services v. Bowen*, 496 F.Supp. 894 (N.D. Ind.1980), *aff'd sub nom. Gary-Northwest Indiana Women's Services v. Orr*, —— U.S. ——, 101 S.Ct. 2012, 68 L.Ed.2d 321 (1981).

Missouri argues *Roe* is dispositive here. On the basis of the record and contentions of the parties we deem the issue not so easily resolved. In 1973 when *Roe* was written D&E was not a well-known and common means of performing second trimester abortions. The record demonstrates that today D&E is the most often utilized and safest procedure for second trimester abortion up to 15 weeks. 483 F.Supp. at 685 n.9, & 686 n.13. Yet the district court found that D&E is not generally available to women seeking abortions in Missouri hospitals.[10] It was on this basis the district court found the hospitalization requirement invalid. We perceive the settled standard in reviewing state regulation of abortion rights of the mother to be (1) whether the state requirement imposes a substantial interference and burden on the woman's decision to have an abortion and if so (2) whether the state has shown a compelling basis for the law, that is, that the burden is not undue or unjustifiable. *See Charles v. Carey*, 627 F.2d 772 (7th Cir. 1980). In applying the strict scrutiny test, it, of course, must be acknowledged that the state has a compelling interest in the health of the mother and may regulate abortion "in ways that are reasonably related to maternal health." 410 U.S. at 164, 93 S.Ct. at 732.

We view the findings of the district court on this basis.

The conclusion of the district court that second trimester D&E is available in only one hospital in Missouri rests on a thin reed. The conclusion is based solely on the personal knowledge of two physicians, neither one of whom testified that he was familiar with the policies of the hospitals throughout the

their attention to the actions of the hospitals. We express no view on the merits of this argument, but insofar as particular hospitals have characteristics which render their actions "state action", parental consent requirements arguably violate *Danforth's* prohibition against an absolute parental veto. *Cf. Nyberg v. City of Virginia*, 495 F.2d 1342 (8th Cir.), *appeal dismissed*, 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed.2d 136 (1974) (unconstitutional for public hospital to refuse facilities to perform elective abortions); *Hodgson v. Lawson*, 542 F.2d 1350 (8th Cir. 1976); *Wolfe v. Schroering*, 541 F.2d 523, 527 (6th Cir. 1976); *Doe v. Charleston Area Medical Center, Inc.*, 529 F.2d 638 (4th Cir. 1975); *Doe v. Hale Hospital*, 500 F.2d 144 (1st Cir. 1974), *cert. denied*, 420 U.S. 907, 95 S.Ct. 825, 42 L.Ed.2d 837 (1975). *Poelker v. Doe*, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977), held that a city operating a municipal hospital need not provide publicly financed hospital services for abortions for indigent women. It does not hold that a state hospital may refuse to allow physicians to perform paid abortions in the hospital, which was the issue in *Nyberg.*

10. The record does not make clear why D&E is not readily available for hospitalized second trimester abortions.

state.[11] Second, although the record suggests that hospitalized D&Es, when available, are more expensive than nonhospitalized D&Es and that the overall effect of the hospitalization requirement has been to substantially reduce the number of second trimester abortions in Missouri, the district court made no findings. We think it essential the district court evaluate this overall testimony and make findings in this regard. We think it likewise essential that the record should be factually supplemented as to the availability or nonavailability of D&E procedures in hospitals throughout the state.

■ From these factual conclusions the district court must then determine whether or not the hospitalization requirement imposes a substantial interference and burden on the woman's decision to have an abortion. Perhaps one can assume that it is implicit in the district court's opinion that mandated second trimester hospitalization limits the accessibility of abortion in Missouri, but based on the court's analysis it is not clear whether the correct legal standard was applied. We think it fundamental that the district court explicitly address the threshold question: Whether the hospital regulation directly interferes with the woman's decision to terminate her pregnancy. Assuming the district court, based on the evidence, answers this question in the affirmative, then the regulation comes under the strict scrutiny standard and the State has the burden to justify the regulation by demonstrating a compelling state interest.

In this regard, the district court properly considered the Supreme Court's previous evaluation of second trimester abortion regulations in *Planned Parenthood v. Danforth*, 428 U.S. 52, 75–79, 96 S.Ct. 2831, 2843–2846, 49 · L.Ed.2d 788 (1976). The Court found that the saline amniocentesis method, prohibited by a Missouri statute, was the most prevalent second trimester method and that supposedly safer alternatives (i. e., prostaglandins) were not readily available. Under these circumstances, the Court concluded that the prohibition against saline was not reasonably related to the woman's health since it prevented use of a method that was safer for the woman than the available alternatives.

If the district court finds the hospital requirement constitutes a direct interference with the woman's decision to have an abortion the court must then determine whether Missouri's requirement reasonably relates to the protection of the woman's health. The State, in meeting this burden, must show that nonhospitalized D&E can reasonably be considered more dangerous than hospital procedures, including hospitalized D&E. It must also show that the methods that it argues are as safe or safer than nonhospitalized D&E are actually available to Missouri women. *Cf. Planned Parenthood v. Danforth*, 428 U.S. at 77 & n.12, 96 S.Ct. at 2845 & n.12 (burden on state to show availability). Missouri cannot "force a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed." *Id.* at 79, 96 S.Ct. at 2845.

From this discussion it is clear that the central issue is the relative safety of nonhospitalized D&E and hospitalized methods. The record contains conflicting testimony about safety. Experts called by Planned Parenthood claim nonhospitalized D&E is *safer* than all hospitalized procedures, because hospitals create greater risks of infection, cause greater anxiety, and use general anesthesia. They also point to recent standards issued by the American Public Health Association and the American College of Obstetricians and Gynecologists, retracting their previous recommendation for hospitalization for second trimester abortions. On the other hand, the State's witnesses claim that hospitalization is essential because of

11. Dr. Palmer was asked "Are you familiar with any hospital within the St. Louis metropolitan area that performs D&E second trimester procedures?" A. "No." (T. 135). Dr. Kassar was asked "Do you know of any other hospital in the State of Missouri which allows the use of dilatation and evacuation in the second trimester?" A. "Not to my knowledge." (T. 257).

the increased risks in the second trimester. The district court made no finding as to the relative safety of nonhospitalized and hospitalized methods.[12] On remand, if the district court determines that the hospital requirement imposes a substantial interference and burden on the woman's decision to have an abortion then the court should make explicit findings as to the safety of nonhospitalized D&E compared to hospitalized methods.

In sum, we find that the district court failed to properly analyze the hospitalization requirement. On remand, it should first determine if the regulation creates substantial interference with and imposes a direct burden on the woman's decision to have an abortion. If it does, the district court should evaluate whether the hospitalization requirement is justified by a compelling state interest; i. e., whether it is reasonably related to the woman's health. Missouri bears the burden of justifying the restriction. We therefore vacate the district court's finding that Missouri's hospitalization requirement is unconstitutional. We remand this question back to the district court by certification and request the district court to take additional evidence, if deemed necessary by the parties or by the court, and to make additional findings in accord with this opinion. We respectfully request the district court to certify the record and its findings back to this court within 90 days.

## II. *Parental or Court Consent For Minors.*

Section 188.028 prohibits abortions for women under 18 unless parental or court consent is obtained. The district court declared this section unconstitutional. In *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Court declared that a state requirement that all minors obtain parental consent prior to obtaining an abortion was unconstitutional. In *Bellotti v. Baird* (Bellotti II), 443

12. The district court stated:

On the record before it, this Court is convinced that aside from the question whether it is performed in a hospital or in an out-patient clinic,[12] dilatation and evacuation is the safest of the presently available post-twelve week abortion techniques.[13]

[12] Dr. Bernard Nathanson, one of defendants' experts, testified that the morality (sic) and morbidity rates for D&E procedures performed outside a hospital were probably no different than those performed in a hospital.

[13] Mortality rates (per 100,000 cases) for post-12 week abortion techniques for the years 1972–1977 are as follows:

| | |
|---|---|
| D & E | 8.3 |
| Prostaglandins and other agents | 10.8 |
| Saline instillation | 15.5 |
| Hysterotomy and hysterectomy | 45.3 |

Center for Disease Control, U. S. Dep't. of H. E. W., *Abortion Surveillance 1977*, Table 23.

483 F.Supp. at 686.

The quoted sentence from the text of the district court's opinion is ambiguous. It can be read as saying that it is not necessary to decide whether D&E is safer in a hospital or outside a hospital and that it suffices to say that if you average the mortality from D&E in hospitals and outside hospitals, D&E is safer than other methods. It can also be read as saying that D&E is equally safe in a hospital or outside a hospital, and that the D&E safety rate exceeds all other methods. The first reading would be an inadequate finding, since to invalidate a hospitalization requirement we must know the safety effects of hospitalization. General conclusions which average the two safety rates do not answer that question.

The footnotes do not resolve the ambiguity. The court refers to Dr. Nathanson's testimony that D&E is probably equally safe in a hospital or outside a hospital, but there is no finding to that effect. In footnote 13, the court refers to a study concluding that the mortality rate for D&E is lower than the mortality rate for other methods. These statistics do not distinguish between hospitalized D&E and nonhospitalized D&E, so there is no way to determine from them whether a nonhospitalized D&E is significantly safer than the other available methods.

Planned Parenthood argues that the record supports a finding that nonhospitalized D&E is as safe or safer than hospitalized D&E. It is true that several physicians testified to that effect. However, there were also expert witnesses who disagreed. Since there are apparently no statistics that distinguish between hospitalized and nonhospitalized procedures, the conclusion depends upon an evaluation of the relative weight to be given the testimony of the experts. We decline to make a finding from the cold record where it depends on the credibility of the experts, a question uniquely within the province of the district court.

U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), four justices concluded that the Massachusetts statute requiring judicial approval in lieu of parental consent was unconstitutional in part because it allowed a court to deny permission based on its perception of the woman's "best interests", even when a minor was mature enough to make her own decision. These four justices (Powell, Burger, Rehnquist and Stewart) described a procedure that would satisfy constitutional requirements:

> A pregnant minor is entitled in such a proceeding to show either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests. The proceeding in which this showing is made must assure that a resolution of the issue, and any appeals that may follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained. In sum, the procedure must ensure that the provision requiring parental consent does not in fact amount to the "absolute, and possibly arbitrary, veto" that was found impermissible in *Danforth. Ibid.*

443 U.S. at 643–44, 99 S.Ct. at 3048–49 (footnote omitted).

The Missouri procedure found in subsection 188.028.2(4) provides:

> (4) In the decree, the court shall for good cause:
>
> (a) Grant the petition for majority rights for the purpose of consenting to the abortion; or
>
> (b) Find the abortion to be in the best interests of the minor and give judicial consent to the abortion, setting forth the grounds for so finding; or
>
> (c) Deny the petition, setting forth the grounds on which the petition is denied.

The district court concluded that the statute was invalid because in (c) it allows the state court unbridled discretion to "deny the petition, setting forth the grounds on which the petition is denied," limited only by the requirement that the court has "good cause." 483 F.Supp. at 687–90.

■ We would agree if the statute provides discretion to deny permission to a minor for *any* good cause it would violate the principles set forth in *Danforth* and *Bellotti II.* We believe, however, that in the context of the statutory language, a denial of the petition would initially require the court to find that the minor was not emancipated and was not mature enough to make her own decision and that an abortion was not in her best interests. These findings and the ultimate denial of the petition must be supported by a showing of "good cause". When the statute is so interpreted and applied it obviates Planned Parenthood's objections. Under these circumstances we find the judicial consent provision of the Missouri statute constitutional.

In view of the district court's finding that the judicial approval procedure was invalid the district court did not address Planned Parenthood's other objections to section 188.028. In the interest of judicial economy we do so now. First, Planned Parenthood points out that subsection 188.028.2(2) requires notice to all parents. It is argued that this is unconstitutional, relying on a statement in Justice Powell's opinion in *Bellotti II*:

> [E]very minor must have the opportunity—if she so desires—to go directly to court without first consulting or notifying her parents. If she satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent.

443 U.S. at 647, 99 S.Ct. at 3050.

The Supreme Court recently addressed this issue further in *H. L. v. Matheson*, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981). The Utah statute challenged in *Matheson* required the physician to "notify, if possible, the parents or guardian of the woman upon whom the abortion is to be performed, if she is a minor or the husband of the woman, if she is married." Utah Code Ann.

§ 76–7–304(2). *Matheson* holds that the state may require that notice be given to the parents of a minor who is living with and dependent upon her parents, is not emancipated by marriage or otherwise, and has made no claim or showing as to her maturity or her relations with her parents. *See* 101 S.Ct. at 1170. The Court narrowed its decision to these facts because the plaintiff "did not allege or proffer any evidence that either she or any member of her class is mature and emancipated." *Id.* at 1169.

*Matheson* establishes that the parental notice requirement in section 188.028 would be constitutional for minors like the plaintiff in that case. Our inquiry does not stop there, however. The standing of plaintiffs in this case is quite different from that of H. L. Here, plaintiffs are corporations and physicians who seek to provide abortion services. The complaint says that Planned Parenthood and Reproductive Health serve a patient population comprised of 36.5% and 16% of persons under 18, respectively. Plaintiffs have established that some of their patients include minors who are mature enough to make an abortion decision ("mature minors") or minors for whom an abortion without parental consultation is in their best interest ("best interests" minors). Although the complaint makes no specific claim in this respect, testimony of several plaintiffs indicates a desire to perform abortions for such individuals.[13] In general, these physicians agreed that notice requirements are a burden on availability of services, interfere with the doctor-patient relationship, and do not serve the best interests of the patients. In sum, the record makes it clear that these physicians deal with minors who they consider mature enough to make a decision without parental involvement, or for whom parental involvement is not in their best interests.

◼ We are thus faced with the question left open in *Matheson*: whether it is constitutionally permissible to require mature or "best interests" minors to notify their parents prior to a court hearing in which they seek judicial consent for an abortion. We have no need to analyze this problem at length, as the justices of the Supreme Court have already explored it. As noted, in *Bellotti II*, Justice Powell's opinion advances persuasive reasons for concluding that parental notice is unduly burdensome in cases involving mature or "best interests" minors. 443 U.S. at 642–48, 99 S.Ct. at 3047–51. In *H. L. v. Matheson*, Justices Powell and Stewart concurred in the decision, but insisted that "a State may not validly require notice to parents in all cases, without providing an independent decisionmaker to whom a pregnant minor can have recourse if she believes that she is mature enough to make the abortion decision independently or that notification otherwise would not be in her best interests." 101 S.Ct. at 1176–77. Justices Marshall, Brennan and Blackmun concluded that the Utah statute, which is very similar to the Missouri statute, is unconstitutional on its face because the burdens it imposes exceed any identifiable state interests. *Id.* at 1184–94. The analysis in these opinions strongly suggests that subsection 188.028.2(2) is unconstitutional because it requires mature or "best interests" minors to give notice to their parents prior to the court hearing.[14] We so hold. *See also Wynn v. Carey*, 582 F.2d 1375, 1388 (7th Cir. 1978).

---

**13.** *See* Widdicombe (Reproductive Health's Director) (T. 30–36, 74–78) (Reproductive Health identifies mature minors through screening process; some minors show greater maturity than persons of higher age); Palmer (T. 133–37) (some minor patients in his practice capable of giving informed consent without parental consent); Kassar (T. 216–19) (ability to give informed consent depends on factors other than age); Crist (T. 350–52) (presently provides abortions to women under 18 without parental involvement; believes many such women are capable of consent; cites example of "best in-

terests" exception based on statistics showing 50% of those 12 years old and under who seek abortions are incest victims); Vera (T. 444–47) (psychiatrist who counsels women with unwanted pregnancies; personal experience includes instances where parental involvement has adverse effects).

**14.** Subsection 188.028.2(2) is severable from the remainder of the statute, so our holding does not affect the remainder of section 188.-028.

■ Planned Parenthood also argues that several other features of section 188.028 are unconstitutional. They claim that the statute's supposed purpose of facilitating parental consultation is undermined by its overinclusiveness and underinclusiveness. They argue it is overinclusive because it requires the involvement of the parents of unemancipated minors who have been widowed or divorced and they argue that the statute is underinclusive because it does not require involvement of the parents of emancipated minors "regardless of their age, maturity, intelligence, education or experience. . . ." While we acknowledge that the classification may not be perfect, we conclude emancipation is a sufficiently accurate indicia of dependence on parental advice to serve as the basis for a legislative judgment by the Missouri legislature.

Nonetheless, Planned Parenthood claims that "emancipated" is excessively vague. They refer to confusion among various witnesses about the meaning of the term. As will be more fully developed later in this opinion, we conclude that to conduct a criminal prosecution under this statute there must be proof of scienter as to the elements of the crime. A successful prosecution would require proof that the physician performing the abortion knew that a minor who received an abortion under subsection 188.028.1(2) was not "emancipated." Although the presence of a scienter requirement will not entirely eliminate problems caused by vagueness, we are satisfied it is sufficient here.[15] *See Colautti v. Franklin*, 439 U.S. 379, 395, 99 S.Ct. 675, 685–86, 58 L.Ed.2d 596 (1979).

**15.** We note that the Missouri Supreme Court has considered the proof necessary to show emancipation in the context of parental tort liability. *See Wurth v. Wurth*, 322 S.W.2d 745, 746 (1959).

**16.** The delay argument is based in part on the 48 hours of additional delay required by section 188.039. Since we conclude that it is unconstitutional to require a 48-hour delay, the potential for delay is reduced. See Part IV A, *infra*.

**17.** Missouri argues that none of the plaintiffs had standing to challenge section 188.030. The state relies on interrogatories submitted by the plaintiffs in which they said their abortion practices were limited to nonviable fetuses.

■ Planned Parenthood also claims that the statute does not assure that the procedure will be anonymous and expeditious.[16] We are satisfied that anonymity is sufficiently protected by these procedures, which do not require the minor to disclose her name. Furthermore, the statute sets forth reasonable time requirements for court action on the petition. Although the statute does no more than direct the Missouri Supreme Court to promulgate rules for expedited appellate review, we are confident the Missouri Supreme Court will exercise its jurisdiction in a manner that recognizes the serious dangers caused by delay.

We find the judicial consent provision under section 188.028 to be constitutional. We agree with Planned Parenthood, however, that the notice provisions found in subsection 188.028.2(2) are impermissible and must be set aside.

III. *Restrictions on Abortion after Viability.*

■ The district court held that subsection 188.030.1 is unconstitutional because it allegedly imposes criminal liability for an erroneous but good faith determination that a fetus is nonviable. The district court also found subsections 188.030.2 and 188.030.3 unconstitutional on similar grounds. Further, subsection 188.030.2 was held unconstitutionally vague, and subsection 188.030.3's requirement of a second physician was held to be overbroad because it requires a second physician even when there is no reasonable chance of fetal survival.[17]

However, at trial Dr. Kassar testified that he had once conducted an abortion at approximately 28 weeks, which is within the period of viability identified in *Roe v. Wade*. The district court found that this testimony established that "[e]nforcement of section 188.030 would have an immediate and direct effect on the medical practice of Dr. Kassar." In *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), and *Planned Parenthood v. Danforth*, 428 U.S. 52, 62, 96 S.Ct. 2831, 2837, 49 L.Ed.2d 788 (1976), the Court recognized the standing of plaintiff physicians, since "[t]he physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that *does not meet the statutory ex-*

A. *Subsection 188.030.1: Mental Culpability Requirement* [18]

The district court based its holding that the State unconstitutionally imposed criminal liability without fault on *Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979).

In *Colautti* the Supreme Court said the Pennsylvania statute was unduly vague and that the vagueness was "compounded" by the fact the statute subjected a physician to liability without fault. The Court agreed that the Pennsylvania criminal code [19] required scienter as to "whether the physician's actions will result in the death of the fetus." *Id.* at 394, 99 S.Ct. at 685. However, it did not contain a requirement "that the physician be culpable in failing to find sufficient reason to believe that the fetus may be viable." *Id.* at 394–95, 99 S.Ct. at 685–86.

The district court acknowledged that subsection 188.030.1 does not have the vagueness problems encountered with the Pennsylvania law. However, it found that the Missouri law lacks a culpability requirement, and found that this alone rendered the statute unconstitutional. 483 F.Supp. at 692. Without a culpability requirement, the Missouri statute would create a "profound chilling effect on the willingness of

physicians to perform abortions near the point of viability in the manner indicated by their best medical judgment." 439 U.S. at 396, 99 S.Ct. at 686.

Missouri claims section 188.075 requires culpability as to viability: [20]

Any person who contrary to the provisions of sections 188.010 to 188.085 *knowingly performs or aids in the performance of any abortion or knowingly fails to perform any action* required by sections 188.010 to 188.085 shall be guilty of a class A misdemeanor and, upon conviction, shall be punished as provided by law.

Mo.Ann.Stat. § 188.075 (Vernon) (emphasis added).

The district court acknowledged that section 188.075 requires a culpable mental state, but decided that like the Pennsylvania law in *Colautti*, it reaches only the act of abortion and not the viability determination.

We respectfully disagree with the district court's interpretation of the Missouri law. To violate section 188.075, one must do more than knowingly perform an abortion—one must knowingly perform an abortion that is contrary to subsection 188.030.1. Since the only abortions contrary to subsection 188.030.1 are abortions on viable un-

---

ceptions and conditions." *Doe v. Bolton*, 410 U.S. at 188, 93 S.Ct. at 745. Since Dr. Kassar's credibility was a matter for the district court to resolve, and the district court accepted his testimony, he has standing. It is therefore unnecessary to determine whether other plaintiffs may also have standing.

**18.** Subsection 188.030.1 reads:

No abortion of a viable unborn child shall be performed unless necessary to preserve the life or health of the woman. Before a physician may perform an abortion upon a pregnant woman after such time as her unborn child has become viable, such physician shall first certify in writing that the abortion is necessary to preserve the life or health of the woman and shall further certify in writing the medical indications for such abortion and the probable health consequences.
Mo.Ann.Stat. § 188.030.1 (Vernon).

**19.** The Pennsylvania Act provided that a person who failed to make a viability determination or to exercise the prescribed standard of care was "subject to such civil or criminal

liability as would pertain to him had the fetus been a child who was intended to be born and not aborted." Pa.Stat.Ann., Tit. 35, § 6605(a) (Purdon 1977). Criminal sanctions, if any, would be imposed under the separate Pennsylvania law of criminal homicide.

**20.** In the district court Missouri argued that the court should abstain and permit the state courts to construe this statute. Missouri has not argued for abstention on this appeal. We realize that "it would appear that abstention may be raised by the court *sua sponte*." *Bellotti v. Baird*, 428 U.S. 132, 144 n.10, 96 S.Ct. 2857, 2864 n.10, 49 L.Ed.2d 844 (1976). Nonetheless, we see no reason to abstain here, since we find that the language of the Missouri statute clearly withstands the objections raised by Planned Parenthood. Furthermore, we note that Missouri has no certification procedure whereby this court can refer questions of state statutory construction to the state supreme court. *Cf. id.* at 150–51, 96 S.Ct. at 2867–68.

862

born children, a physician could not knowingly perform an abortion contrary to subsection 188.030.1 unless he *knew* the child was viable. A good faith determination of nonviability would be a defense.

■ This interpretation can also be reached by assuming that by using "knowingly" as it did, the Missouri legislature intended to describe the mental state required for all the crimes governed by section 188.075. However, because of the breadth of the activity covered by this penalty statute, the legislature was not precise as to the application of the mental state requirement to particular elements. Missouri has enacted a statute to cope with this exact situation:

> If the definition of an offense prescribes a culpable mental state but does not specify the conduct, attendant circumstances or result to which it applies, the prescribed culpable mental state applies to each such material element.

Mo.Ann.Stat. § 562.021 (Vernon) (effective Jan. 1, 1979).

In this case, section 188.075 prescribes "knowingly" as the mental state, and Missouri statutes further define "knowingly":

> A person *"acts knowingly"*, or with knowledge,
>
> (1) With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or
>
> (2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result.

Mo.Ann.Stat. § 562.016.3 (Vernon).

As applied to the elements of this crime, the State would be required to prove that the physician was (1) aware he was performing an abortion; (2) aware this was a viable unborn child; and (3) aware the abortion was not necessary to preserve the life or health of the woman. When interpreted in this fashion, the statute does not impermissibly impinge on the rights of women and their physicians. It can be used to punish only those physicians who *know* that a fetus is viable and that the abortion is not necessary to the life and health of the woman. Such regulation is clearly permissible under *Roe.*

**B. *Subsection 188.030.2.***

■ The district court next considered subsection 188.030.2.[21] The court first found this section void for failure to require a culpable mental state. We again disagree with this interpretation; we conclude that the Missouri statutes require the State to prove culpability for the elements of this crime, just as they require proof under subsection 188.030.1. The State would have to prove, beyond a reasonable doubt: (1) that the doctor knew the child was viable; (2) that he knew the method he chose was not the available method most likely to preserve the life and health of the unborn child; and (3) that he knew the method he used was less or equally dangerous to the life and health of the woman than the available method most likely to preserve the life and health of the unborn child.

The district court also struck down this section of the Missouri law for unconstitutional vagueness. The court focused on the portion stating that the physician "may" use another technique when the technique that would be safest for the fetus presents "a greater risk to the life and health of the woman" than an available alternative.

In *Colautti,* one of the criticisms of the Pennsylvania statute was that the choice of

21. Subsection 188.030.2 reads:

Any physician who performs an abortion *upon a woman carrying a viable unborn child* shall utilize the available method or technique of abortion most likely to preserve the life and health of the unborn child. In cases where the method or technique of abortion which would most likely preserve the life and health of the unborn child would present a greater risk to the life and health of the woman than another available method or technique, the physician may utilize such other method or technique. In all cases where the physician performs an abortion upon a viable unborn child, the physician shall certify in writing the available method or techniques considered and the reasons for choosing the method or technique employed. Mo.Ann.Stat. § 188.030.2 (Vernon).

method to be utilized turned on whether an alternative was "necessary". 439 U.S. at 397–401, 99 S.Ct. at 686–689. The Missouri statute does not use this term. Instead, the choice of method turns on a direct balance of risk. If the risk to the woman from the "fetal survival method" [22] is *greater than* the risk to her from alternative methods, the physician *may* choose an alternative. Implicitly, if the risk to the woman from the fetal survival method is *less than or equal to* the risk to her from available alternative methods, the physician *must* use the fetal survival method. Given the precision of this balance, the question is not whether the statute is vague, but whether the woman's constitutional rights are violated by a requirement that a fetal survival method *must* be used whenever the risks to the woman with that method are less than or equal to the risk from other possible methods.[23]

▐ The State has regulated post-viability abortions by requiring use of particular methods. This is clearly within the State's power, as long as it does not interfere with medical judgments as to the method necessary for the preservation of the life or health of the mother. *Roe v. Wade*, 410 U.S. at 164–65, 93 S.Ct. at 732–33. Thus, the Missouri statute is clearly constitutional in requiring use of a fetal survival method when the risks of that method to the woman are lower than alternatives. The only remaining question is whether the state can constitutionally require the use of the fetal survival method in cases where the risk is equal. By definition, if the risk is absolutely equal, the life and health of the mother are subjected to no greater risk by requiring use of the fetal survival method.[24] By requiring use of such a method when the risks from it are less than or equal to the risk of alternatives, Missouri is within permissible bounds of regulation.[25]

We have no disagreement with Planned Parenthood's argument that these are medical judgments that should not be second-guessed. However, if, as we have held, there is a culpability requirement, the State

---

**22.** This term is used here to refer to "the available method most likely to preserve the life and health of the unborn child." Mo.Ann.Stat. § 188.030.2 (Vernon).

**23.** The district court emphasized that the statute says the physician *"may"* use another technique, implying that this inserts impermissible vagueness. However, the effect of the word "may" in this provision is this: when the risk to the woman of a fetal survival method is greater than the risk of available alternative methods, the physician *may* choose whatever method he wishes. In other words, when the risk of the survival method is greater, the statute leaves the doctor's choice exactly as it would be without the existence of this statute: to choose the method he deems appropriate. While this means he may choose the method that is more dangerous to the woman and safer for the fetus, the physician could have made a similar decision prior to passage of this statute; hence, the statute does nothing to alter the rights of the woman and her physician. We are aware of no decisions that have required the state to pass legislation *requiring* physicians to choose a method most favorable to the woman's life and health.

**24.** In discussing the Pennsylvania statute in *Colautti*, the Court observed that the statute "does not clearly specify, as appellants imply, that the woman's life and health must always prevail over the fetus' life and health when they conflict." 439 U.S. at 400, 99 S.Ct. at 688. This statement is in the context of a discussion of the vagueness of the statute, and merely rebuts a claim by Pennsylvania as to the specificity of the statute. *Colautti* did not hold that language of this nature is constitutionally required. Nor does it hold that a state may not require use of a method more likely to lead to fetal survival if the risks to the woman are equal. Even if this language were binding, by definition the woman's life and health and the fetus' life and health are not in "conflict" when the method favoring one's survival has no detriment to the chances of the other to survive.

**25.** *Cf. Margaret S. v. Edwards*, 488 F.Supp. 181 (E.D.La.1980). The court held that a Louisiana statute was unconstitutional. It provided:

Any physician who shall perform or induce an abortion upon a pregnant woman where the presumption of viability exists shall utilize the available method or technique of abortion most likely to preserve the life and health of the unborn child.

The court observed that this made no allowance for the life and health of the mother, as required by *Roe*. Here, of course, the statute allows the doctor to consider the life and health of the woman in choosing a method.

faces a stringent burden of proof as to the physician's actual knowledge of the viability of the child and the danger of the alternative methods. The State's power to regulate does not permit it to decide if a particular child is viable, or to choose a particular procedure, or to decide whether a procedure is necessary for the life and health of a particular woman. These decisions are left to physicians. The post-viability regulatory power does permit the State to criminalize abortions performed *after* a physician has made a judgment that a fetus is viable and the abortion or abortion method is not necessary for the life and health of the woman.

### C. Second Doctor Requirement.

■ The district court declared subsection 188.030.3 [26] unconstitutional because of the lack of a culpability requirement. Again, we find that the Missouri statutes require culpability as to each material element of the crime.

The district court also had another reason for striking down this section: the second physician requirement is overbroad because it requires a second physician even when the fetus has no reasonable chance of survival. Thus, the requirement is an "undue burden" in at least some cases. *See Charles v. Carey*, 627 F.2d 772 (7th Cir. 1980).

Review of this holding requires review of the support for the two underlying factual conclusions: (1) that the second physician requirement is a burden and (2) that there is no possible justification for a second physician during a D&E.

### 1. Burden on Decision.

■ Missouri does not deny that costs are increased by requiring a second physician, thereby restricting availability of the abortion.[27] Instead, Missouri argues that increased cost is not a direct burden. Missouri bases this argument on *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), and other cases dealing with refusals by states or the federal government to make government funds available for abortions. *See also Williams v. Zbarz*, 448 U.S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). However, Missouri's argument is not supported by these cases, which focus on the "basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Maher v. Roe*, 432 U.S. at 475, 97 S.Ct. at 2383. The state's refusal to pay for abortions is said not to be a "direct interference" because it "places no governmental obstacle in the path of a woman . . .", *Harris v. McRae*, 100 S.Ct. at 2687, that is, the regulation does not create the woman's lack of finances, but merely fails to remedy it. In contrast, a government-imposed regulation that adds to the cost of abortion is a government-created obstacle and is subject to strict scrutiny. If the rule was as Missouri claims, the state would be free to add on any costly requirements under the guise of regulation, and would not be required to justify these requirements by a compelling state interest.

---

**26.** Subsection 188.030.3 states:

An abortion of a viable unborn child shall be performed or induced only when there is in attendance a physician other than the physician performing or inducing the abortion who shall take control of and provide immediate medical care for a child born as a result of the abortion. During the performance of the abortion, the physician performing it, and subsequent to the abortion, the physician required by this section to be in attendance, shall take all reasonable steps in keeping with good medical practice, consistent with the procedure used, to preserve the life and

health of the viable unborn child; provided that it does not pose an increased risk to the life or health of the woman.
Mo.Ann.Stat. 188.030.3 (Vernon).

**27.** *E. g.*, Kassar (T. 226) (burden because requires presence of pediatrician for up to 24 hours); Crist (T. 354–57) (costs are increased by second physician requirement; conclusory statement it interferes with doctor-patient relationship); Kretzschmar (T. 394–95) (requiring second physician significantly increases cost; interferes with doctor-patient relationship and burdens availability).

It is apparent from even the conclusory testimony here that a second physician requirement would raise the cost of an abortion, thereby decreasing its availability and interfering with the decisions of some women to obtain abortions. Missouri did not challenge that proposition, and must justify its law with a compelling state interest.

### 2. Justification for Second Physician During D&E.

We move then to the argument that there is no possible justification for a second physician during a D&E procedure. Missouri claims there is no overbreadth in the second doctor requirement because doctors do not perform D&Es after viability. However, Dr. Crist testified (T. 427–29), with examples from his practice, that D&E may be the best medical practice at 28 weeks; he also testified that in the 60 days prior to his testimony he had done five post-24 week abortions by D&E. He chose this method because "there were absolutely contraindications to the use of hypertonic solutions or the use of prostaglandins, or the induction of labor." (T. 438).

 Missouri points to testimony by other physicians that they do not or would not use D&E at these stages. However, this serves only to indicate that the question is one in which medical opinions and circumstances may differ. There is no error in the district court's factual conclusion that for some patients and physicians, D&E is the method of choice even after viability is possible.[28]

The next question is whether the district court correctly concluded that a fetus cannot survive D&E. If the fetus could survive, the state may be able to require the presence of a second physician in further-

ance of its compelling interest in the potential life of the fetus.

The D&E procedure is described in Tietze, Induced Abortion: 1979 (3d ed. 1979).

When vaginal evacuation is performed in the second trimester, it typically involves use of a small forceps for the dismemberment and removal of the fetus, of a suction cannula for the aspiration of amniotic fluid and of placental and fetal debris, and of a surgical curette to ensure complete evacuation. To minimize the risk of laceration, laminaria is often used to dilate the cervix.

*Id.* at 68.

Several physicians said that dismemberment of the fetus is not always essential in a D&E procedure. However, Dr. Kassar indicated this was true of a smaller fetus; presumably, a viable fetus is larger. Several physicians testified that there was no chance a viable fetus would survive D&E.[29]

Missouri relies solely on Dr. Crist's testimony. Dr. Crist's testimony on cross-examination contradicted in part his earlier testimony, and did not specifically refer to a fetus that had reached viability. It was also contradicted by the overwhelming weight of testimony of doctors testifying for both sides. These experts all agreed that when D&E is performed on a viable fetus there is no chance of survival, apparently because the fetus has reached a size where dismemberment is unavoidable. We conclude the district court's finding of fact as to the chances of survival is not clearly erroneous.

We agree with the district court that the second physician requirement is overbroad, and thus imposes a burden on women in

---

28. We note that the choice of D&E after viability is subject to the requirements of subsection 188.030.2. Thus D&E is not to be used when the child is viable and other methods are available that are more likely to preserve its life and health, and those methods do not pose a greater risk to the life and health of the woman than another available method or technique.

29. *E. g.* Crist (T. 355) ("no chance"); Kretzschmar (T. 393); Nathanson (T. 615) (D&E never

results in a live birth); Schmidt (T. 836) (no reason for second physician when D&E is used on viable fetus; no possibility of survival); Martin deposition, Defendant's Exhibit Q at 76–77 (live birth after D&E "an impossibility"). *See also* Kassar, (T. 258) (during second trimester, fetus is usually of sufficient size that skull must be crushed for D&E; chance of fetal survival in this type of procedure is "nil").

cases where the burden is not justified by any possibility of survival of the fetus. We therefore affirm the district court's holding.[30]

IV. *"Informed Consent."*

Section 188.039 requires that the attending physician give a woman specific information prior to an abortion, and requires that 48 hours lapse between giving the information and the abortion. It also requires that the woman sign a consent form acknowledging that she has been given the required information.

A. *48 Hour Wait.*

■ The district court held that the 48 hour waiting requirement was unconstitutional, based on evidence that it increases delay, and delay increases the risk to the woman. Furthermore, it "requires that a woman make a minimum of two visits to her physician or to a clinic. This requirement involves additional time and expense and, for women living outside the metropolitan areas, may require additional travel or subsistence expense during the delay." 483 F.Supp. at 696. We affirm the ruling of this district court. *See Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1014–16 (1st Cir. 1981) (preliminary injunction against 24 hour wait); *Charles v. Carey,* 627 F.2d 772, 785–86 (7th Cir. 1980) (24 hours).[31]

B. *Notice to Parents of Minors.*

■ Subsection 188.039.2 requires a minor to acknowledge that her parents have been given the information prescribed in section 188.039, and it forbids physicians to perform abortions unless the minor has so acknowledged. The district court held this provision unconstitutional on the grounds it was in contravention to the principles in *Bellotti II,* discussed in Part II, *supra.* On the basis of our discussion of *Bellotti II* and *H. L. v. Matheson* in Part II, *supra,* we agree that this requirement is also unconstitutional because it requires parental notice even when the minor is mature or emancipated or the abortion is in her best interests, and a court has made findings to that effect.

C. *"Probable Physiological and Anatomical Characteristics of the Unborn Child" and "Physical Danger ... and Psychological Trauma".*

Subsection 188.039.2(3) requires the woman to acknowledge that she has been informed of "[t]he probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed." Subsection 188.039.2(4) says she must be informed of "[t]he immediate and long-term physical dangers of abortion and psychological trauma resulting from abortion and any increased incidence of premature births, tubal pregnancies and stillbirths following abortion." The district court held these provisions unconstitutional. 483 F.Supp. at 698–99.

The Supreme Court allows the states to require "informed consent", even in the first trimester. *See Planned Parenthood v.*

---

30. In *Margaret S. v. Edwards,* 488 F.Supp. 181 (E.D.La.1980), the court discussed the constitutionality of a second physician requirement and concluded that such requirements were permissible, although the Louisiana statute imposed improper standards on the second physician. The court did not deal specifically with the D&E method, so its discussion was based on an evaluation of the chances of a live birth using any method. The court found that "the State can choose to be prepared for those rare instances when there is a live birth." *Id.* at 201. Nothing in this conclusion is in conflict with the result reached here. We do not reach the question of the state's right to require a second physician when there is some possibility the fetus may survive.

31. These findings are very similar to the district court's findings on this issue in *Women's Services v. Thone,* 483 F.Supp. 1022 (D.Neb. 1979). Based on these findings, the district court in *Women's Services* held the requirement unconstitutional, and this court affirmed. 636 F.2d 206, 210 (8th Cir. 1980). However, the entire decision in *Women's Services* was remanded to this court to reconsider in light of its recent decision in *H. L. v. Matheson,* 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981). *Matheson* recognizes time is likely to be of the essence in an abortion decision. The Utah statute did not provide a mandatory waiting period.

*Danforth,* 428 U.S. at 64–67, 96 S.Ct. at 2838–2840. Based upon that decision, courts have sustained various provisions designed to insure that the woman has made an informed consent. *See, e. g., Wolfe v. Schroering,* 541 F.2d 523, 526 (6th Cir. 1976); *Planned Parenthood Association v. Fitzpatrick,* 401 F.Supp. 554, 587 (E.D.Pa. 1975), *aff'd,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976). *Cf. Planned Parenthood League v. Bellotti,* 641 F.2d at 1017–18 (state may require use of a specified form if physician is not required to read it or have it signed in office, or discuss it with the woman, and when physician may give any additional information).

Nonetheless, *Danforth* recognized that there are limits to what the state may require. The Court construed "informed consent" to mean:

> [T]he giving of information to the patient as to just what would be done and as to its consequences. To ascribe more meaning than this might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession.

428 U.S. at 67 n.8, 96 S.Ct. at 2840 n.8.

The Court explained this further in *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977):

> The constitutional right vindicated in *Doe* [*v. Bolton,* 410 U.S. 179, [93 S.Ct. 739, 35 L.Ed.2d 201] (1973)] was the right of a pregnant woman to decide whether or not to bear a child without unwarranted state interference. The statutory restrictions on the abortion procedures were invalid because they encumbered the woman's exercise of that constitutionally protected right by placing obstacles in the path of the doctor upon whom she was entitled to rely for advice in connection with her decision. If those obstacles had not impacted upon the woman's freedom to make a constitutionally protected decision, if they had merely made the physi-

cian's work more laborious or less independent without any impact on the patient, they would not have violated the Constitution.

*Id.* 429 U.S. at 605 n.33, 97 S.Ct. at 879 n.33.

Other abortion decisions emphasize the importance of the doctor/patient relationship to the abortion decision. *See, e. g., Roe v. Wade,* 410 U.S. 113, 164, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973); *Doe v. Bolton,* 410 U.S. 179, 196–97, 93 S.Ct. 739, 749–50, 35 L.Ed.2d 201 (1973); *Colautti v. Franklin,* 439 U.S. 379, 387–88, 99 S.Ct. 675, 681–82, 58 L.Ed.2d 596 (1979).

■ In this context, we conclude that the state may not infringe on the *woman's* right to consult with a physician whose judgment and advice on the abortion decision has not been dictated by the state. Such a practice by the state may prevent the woman and the doctor from freely making the judgments left to them by *Roe* and subsequent decisions.

With this principle in mind, numerous courts have declared statutes unconstitutional which require physicians to give patients information contrary to their best judgment or medical opinions. *See Freiman v. Ashcroft,* 584 F.2d 247 (8th Cir. 1978), *aff'd,* 440 U.S. 941, 99 S.Ct. 1416, 59 L.Ed.2d 630 (1979); *Charles v. Carey,* 627 F.2d 772, 783–84 (7th Cir. 1980).[32] Most recently the First Circuit granted a preliminary injunction against a Massachusetts statute requiring "a description of the stage of development of the unborn child." The court found that information was immaterial to medically relevant considerations, and caused emotional distress. It also observed that many women did not want the information and their doctors considered it bad medical practice to force it on them. *Planned Parenthood League v. Bellotti,* 641 F.2d at 1021–23.

---

**32.** *See also Leigh v. Olson,* 497 F.Supp. 1340 (D.N.D.1980); *Margaret S. v. Edwards,* 488 F.Supp. 181, 210–11 (E.D.La.1980); *Akron Center for Reproductive Health v. City of Akron,* 479 F.Supp. 1172, 1203 (N.D.Ohio 1979); *Wynn*

*v. Scott,* 449 F.Supp. 1302, 1316–17 (N.D.Ill.), *appeal dismissed,* 439 U.S. 8, 99 S.Ct. 49, 58 L.Ed.2d 7 (1978), *aff'd,* 599 F.2d 193 (7th Cir. 1979).

■ We agree with the analysis in these cases, and the findings of the district court support similar conclusions here. The district court found that the "anatomical characteristics" and "physical dangers" information "interfere[s] with the right of a woman to consult with her physician regarding abortion free from state interference." 438 F.Supp. at 698. On the basis of repeated testimony it found that some physicians do not believe this information is in the best health interests of their patients, and that it may increase the risks from abortion by increasing the patient's anxiety and tension. Furthermore, some physicians testified they do not believe there are any long-term physical or psychological effects of abortion, or are unaware of such effects. Thus, "such physicians, in the exercise of their best medical judgment, would choose not to provide their patients seeking abortions with [the information]." *Id.* These findings demonstrate that there is a burden on the woman's decision: she is deprived of the freedom to make a decision in reliance on information provided by her physician based upon the physician's best medical judgment. Furthermore, the woman's decision is burdened insofar as the anxiety and tension involved in such a decision are increased without medical justification. There is no rational reason, much less a compelling state interest, that justifies forcing physicians to give women information that the physicians consider injurious to the woman's health or simply untrue. *See Planned Parenthood League v. Bellotti,* 641 F.2d at 1021–22. We affirm the district court's holding that subsections 188.039.2(3) and 188.039.2(4) are unconstitutional.

### D. *Pregnancy and Time Elapsed Since Conception.*

Subsections 188.039.2(1) and 188.039.2(2) require the physician to tell the woman that in the physician's best medical judgment the woman is pregnant and the number of weeks elapsed since the probable time of conception. The district court found these requirements unconstitutional because they would prevent the procedure known as "menstrual extraction." Dr. Crist described this procedure as follows:

> Menstrual extraction, endometrial aspiration, and menstrual induction are all synonomous terms for aspiration or removal of uterine contents prior to the time that a classic urinary pregnancy test would turn positive, and that would be roughly four weeks after conception or 42 days after the last menstrual period.

T. 364–65.

The district court concluded that the physician cannot determine at this stage whether the woman is in fact pregnant. If a physician desired to perform this procedure with intent to cause an abortion, this statute would prevent the procedure because it would be impossible for the physician to give the woman the required information.

Missouri does not claim that a prohibition against menstrual extraction is constitutional, but argues here that the statute does not affect menstrual extraction because a menstrual extraction is not an abortion.[33] As the district court noted, Dr. Crist testified that it is a reasonable medical certainty that 85% of women with a menstrual period 10 days late are pregnant. Given this probability, it is entirely possible that a physician would perform the procedure with intent to terminate a pregnancy. During cross-examination, Dr. Palmer testified:

> Q. Have you ever performed a menstrual extraction intending to terminate the life of a fetus in his or her mother's womb?
>
> A. The intention of a menstrual extraction is either to correct a menstrual problem, which would be a mini-D&C, or if the patient is pregnant and we can't detect it, it is an abortion.
>
> So the answer to your question is yes.

T. 193.

■ The district court found that the present statutory language would prevent

---

**33.** Abortion is defined under Missouri law as "the intentional destruction of the life of an embryo or fetus in his or her mother's womb or the intentional termination of the pregnancy of a mother with an intention other than to increase the probability of a live birth or to remove a dead or dying unborn child." Mo.Ann. Stat. § 188.015(1) (Vernon).

physicians from performing menstrual extractions since it is impossible to be certain that the woman is pregnant. We agree. Since there is no justification for such a prohibition, subsections 188.039.2(1) and (2) were properly declared unconstitutional.

### E. *Attending Physician Must Give the Information.*

Section 188.039.1 requires that the "attending physician" inform the woman of the information described in subsection 188.039.2. The district court said this requirement is constitutional.

Planned Parenthood argues that the information can be given by non-physicians and that requiring physicians to give the information creates scheduling problems, delays, and high costs. They base this in part on their claim that "attending physician" refers to the same doctor who performs the operation.

■■■ The delay and scheduling problems are not significant without the 48-hour waiting period. Similarly, the claims of higher cost and delay due to forcing a physician to spend up to an hour and a half giving this information have been undercut since the court has held several of these information requirements unconstitutional. The portions of subsection 188.039.2 that are not unconstitutional merely require the attending physician to inform the woman of the particular risks associated with the abortion technique to be used, and alternatives to abortion. The district court properly concluded that this minimal requirement is consistent with the principle that the abortion decision is one to be made by a

woman and her physician,[34] and advances the state's interest in insuring that the decision is made with "full knowledge of its nature and consequences." *Planned Parenthood v. Danforth*, 428 U.S. at 67, 96 S.Ct. at 2840. *See Akron Center for Reproductive Health, Inc. v. City of Akron*, 479 F.Supp. 1172, 1204 (N.D.Ohio 1979); *Women's Community Health Center v. Cohen*, 477 F.Supp. 542, 550 (D.Me.1979).

## V. *Pathology Reports.*

Section 188.047 requires:

A representative sample of tissue removed at the time of abortion shall be submitted to board eligible or certified pathologist, who shall file a copy of the tissue report with the state division of health, and who shall provide a copy of the report to the abortion facility or hospital in which the abortion was performed or induced and the pathologist's report shall be made a part of the patient's permanent record.

Mo.Ann.Stat. § 188.047 (Vernon).

In upholding the constitutionality of this provision the court applied a rational basis test and found that the requirement was rationally related to the state's interest in the standards of medical care and was not an undue burden.

Planned Parenthood argues that this regulation burdens the woman's decision to obtain an abortion by increasing costs. The evidence showed this requirement would raise the cost of an abortion by $10 to $40.[35]

As we previously observed, *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65

---

**34.** Planned Parenthood emphasizes the problems raised by requiring that the same doctor give the information and perform the operation. It is by no means clear that the statute requires this. Subsection 188.039.1 says *no physician* shall perform an abortion unless *the physician* certifies informed consent, after *the attending physician* gave the required information. Subsection 188.039.2, which describes the information, refers exclusively to "the attending physician". Although it is not necessary to our holding, one could interpret this to mean that *the attending* physician must give the information, and that another physician

may perform the operation. In contrast, in *Charles v. Carey*, the statute stated explicitly that the information must be given "by the physician who is to perform the abortion." 627 F.2d at 780 n.11. The court's declaration that this section was unconstitutional was based on the burdensomeness of this requirement.

**35.** Judith Widdicombe, Executive Director of Reproductive Health, said the current cost of a first trimester abortion at Reproductive Health is $170, and estimated that this requirement would increase costs by $19.40/abortion (approximately 11.4%).

L.Ed.2d 784 (1980), and similar cases do not hold that imposition of additional costs cannot be a burden on the woman's decision. Section 188.047 applies to all abortions, including those performed in the first trimester. This court has previously discussed review of regulations imposed on those providing first trimester abortions:

[T]he state has the power to insure that the first trimester abortions, like other medical procedures, are performed under conditions providing for the maximum safety of the patient. Statutory provisions which merely authorize the adoption of regulations, albeit during the first trimester, are not unconstitutional. *See Planned Parenthood Association v. Fitzpatrick*, 401 F.Supp. 554, 576 (E.D.Pa. 1975). . . .

Any regulations promulgated under such enabling statutes must, of course, comply with the requirements of the Supreme Court. A state can impose the same regulations on a clinic, specifically built to perform abortions during the first trimester, that are imposed on other clinics that perform surgical procedures requiring approximately the same degree of skill and care as the performance of first trimester abortions. As long as the regulations applying to abortion clinics are the same as those applied to other clinics performing similar surgical procedures, it would not be impermissible to make them specifically applicable to abortion clinics. *Where the state regulates abortions beyond its regulation of similar surgical procedures, that difference in treatment must be shown to be necessitated by the particular characteristics of the abortion procedure. See Word v. Poelker, supra* at 1351–52.

*Hodgson v. Lawson*, 542 F.2d 1350, 1357–58 (8th Cir. 1976) (emphasis added, footnote omitted).

There was uncontroverted testimony that Missouri does not require submission of tissue to a pathologist following other medical procedures. Thus, the difference in requirements must be justified by the particular characteristics of the abortion procedure. As the Seventh Circuit stated in *Friendship Medical Center v. Chicago Board of Health*, 505 F.2d 1141 (7th Cir. 1974), cert. denied, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975):

[T]he state will bear a heavy burden . . . both with respect to showing the existence of a unique medical complication and with respect to showing that the problem is of such a nature as to be beyond the general scope of a doctor's professional judgment.[36]

*Id.* at 1154.

The issue here is not whether pathology reports are useful and even necessary in some cases. They clearly are. Testimony indicated that abnormalities in the tissue may warn of serious, possibly fatal disorders. Instead, the question here is whether Missouri has shown any reason why the physicians and medical facilities performing abortions cannot make medical judgments about the desirability of a pathology report in an individual case, while physicians and medical facilities performing all other types of surgery are free to exercise their professional judgment.

---

**36.** *See Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861 (8th Cir. 1977) (imposition of restrictive "zoning" ordinance on first trimester abortion facility); *Word v. Poelker*, 495 F.2d 1349 (8th Cir. 1974) (ordinance regulating first trimester abortion clinics). *See also Mahoning Women's Center v. Hunter*, 610 F.2d 456 (6th Cir. 1979), *vacated and remanded*, 447 U.S. 918, 100 S.Ct. 3006, 65 L.Ed.2d 1110 (1980) (ordinance requiring expensive equipment and supervision by experienced obstetrician); *Women's Medical Center of Providence, Inc. v. Cannon*, 463 F.Supp. 531 (D.R.I.1978) (requiring licensed physician with hospital privileges); *Florida Women's Medical Clinic, Inc. v. Smith*, 478 F.Supp. 233 (S.D.Fla.1979), *appeal dismissed*, 620 F.2d 297 (5th Cir. 1980) (various first trimester regulations unconstitutional, including pathologist requirement); *Arnold v. Sendak*, 416 F.Supp. 22 (N.D.Ind.), *aff'd*, 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976). *Cf. Baird v. Department of Public Health*, 599 F.2d 1098 (1st Cir. 1979) (abortion-neutral regulation of clinic licensing); *Abortion Coalition v. Michigan Department of Public Health*, 426 F.Supp. 471 (E.D.Mich.1977).

No proof sufficient to explain this distinction was offered by the State. Missouri relied on testimony indicating that some physicians, including pathologists, believe that it is good medical practice to have a pathologist examine any tissue removed from the body. These physicians also expressed concern that in a close case, a pathologist may see something that the ordinary physician would not. We accept this testimony as true, but these justifications do not distinguish tissue obtained from abortion from that obtained in every other surgical procedure. In procedures other than abortion, some physicians may say that every tissue should be examined and that nonpathologist physicians may err in close cases; further, the consequences to the patient of error may be serious. Nevertheless, in procedures other than abortion Missouri leaves it to the professional judgment of the physician to examine the tissue and decide whether a pathologist's examination and the additional costs it imposes are warranted. Physicians who perform abortions testified that they exercise their professional judgment. They routinely perform "gross" examinations of the tissue, and send it to the pathologist if their professional judgment so dictates.[37]

In the absence of a more convincing justification for this distinction between first trimester abortion and other surgical procedures, we hold that the provision is unconstitutional.[38] We emphasize that this does not leave patients unprotected. Missouri law requires that all abortions be performed by physicians. As with any other surgical procedure, patients are protected by "the physician's medical judgment and professional, ethical standards and ... city and state health regulations which have application to [medical] procedures in general." *Word v. Poelker*, 495 F.2d 1349, 1351 (8th Cir. 1974). Patients are also protected by legal remedies for negligence of medical personnel.

## VI. Recordkeeping.

Planned Parenthood challenges the constitutionality of subsection 188.052.2,[39] which deals with post-abortion care.

Planned Parenthood argues that many women will resist supplying the physician with the required information, particularly the time and place of the abortion. If the physician knowingly fails to complete the report, he or she is subject to criminal penalties. So, if a patient seeks the physician's services and refuses to give the required information, the physician can either treat her and risk criminal prosecution or refuse to care for her.

Neither the district court's opinion nor the Missouri defendants addressed this argument. In evaluating it, we observe that to subject this reporting requirement to strict scrutiny would be inappropriate here, as there are no suspect classifications and no fundamental rights at stake. Subsection two does not burden a woman's decision to seek an abortion, since it deals only with

---

37. A "gross" examination is one unaided by a microscope. Pathologists may perform a gross examination or a microscopic examination if they feel it is necessary. This statute does not specify which type of examination the pathologist is to perform. Dr. J. Chandler Smith, Chairman of the Pathology Department at the University of Missouri Medical School, testified that with respect to abortions, a non-pathologist physician is just as capable of performing an adequate gross examination as is a pathologist, and that the abnormalities which are of concern are readily identifiable.

38. *Contra, Wynn v. Scott*, 449 F.Supp. 1302, 1322 (N.D.Ill.), *appeal dismissed*, 439 U.S. 8, 99 S.Ct. 49, 58 L.Ed.2d 7 (1978), *aff'd*, 599 F.2d 193 (7th Cir. 1979) (no burden on woman;

plaintiff did not argue it burdened or discouraged patients).

39. Subsection 188.052.2 provides:

An individual complication report for any post-abortion care performed upon a woman shall be completed by the physician providing such post-abortion care. This report shall include:

(1) The date of the abortion;

(2) The name and address of the abortion facility or hospital where the abortion was performed;

(3) The nature of the abortion complication diagnosed or treated.

Mo.Ann.Stat. § 188.052.2 (Vernon).

post-abortion care.[40] *See Whalen v. Roe,* 429 U.S. 589, 605 n.33, 97 S.Ct. 869, 879 n.33, 51 L.Ed.2d 64 (1977). Thus, this reporting requirement must only be rationally related to a constitutionally permissible purpose. Planned Parenthood is correct in arguing that the statute, on its face, does not state a defense for the physician if the patient refuses to provide information. Apparently Missouri feels that obtaining this information is of such importance that it must threaten the physician with criminal prosecution so that he or she will, in turn, threaten the woman with refusal of treatment. In view of the fact that the cause is to be remanded to the district court we defer judgment on this section until the district court has passed on the same. We therefore certify this issue back to the district court within the same time frame as the other issue certified.

VII. *Attorneys' Fees.*

The district court awarded $22,037.73 to plaintiffs' attorneys.[41] Missouri argues (1) Planned Parenthood did not "prevail" on every issue, since only five of eight challenged sections were partly invalidated; and (2) the district court included fees for travel time and clerical work. They focus mainly on the work done by the "second chair", Barbara Beran, that included taking notes on the testimony, which Missouri claims was "clerical" and not compensable at $60/hour. They also claim that travel time should not be compensated, or should be at a lower rate, and that travel was unnecessary because the suit would have been in St. Louis but for "forum-shopping" by the plaintiffs' attorney.

The award of attorneys' fees should be based on the guidelines set forth in *Johnson v. Georgia Highway Express,* 488 F.2d 714, 717–19 (5th Cir. 1974), adopted by this Circuit. *See Crain v. City of Mountain*

*Home,* 611 F.2d 726, 730 (8th Cir. 1979); *Zoll v. Eastern Allamakee Community School District,* 588 F.2d 246, 252 (8th Cir. 1978). The result obtained is only one factor to be considered, and it is not necessarily an abuse of discretion for the district court to award attorneys' fees based on all of the work performed and not just on the claims on which the plaintiffs were successful. "[A]ttorney's fees awarded under Section 1988 should not be limited to hours expended on those issues as to which the plaintiff was successful." *Crain v. City of Mountain Home,* 611 F.2d at 729 n.7. *See also Johnson v. Nordstrom-Larpenteur Agency,* 623 F.2d 1279, 1282 (8th Cir.), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980); *Brown v. Bathke,* 588 F.2d 634, 637 (8th Cir. 1978).

There is no abuse of discretion in awarding attorneys' fees for a second counsel in a trial of this length and complexity. As for paying for travel time at the same rate as other activities, *Johnson v. Georgia Highway Express* indicates that the trial judge should consider whether the activity is legal work or other activity that could be accomplished by nonlawyers. Nonlawyers could not do the traveling for these attorneys; it was within the trial judge's discretion to award fees for the time consumed. Furthermore, the trial judge could have found that the hourly rate reflected inclusion of nonlegal activity.

The argument that the case could have been brought in the Eastern District of Missouri is frivolous. Venue was proper in the Western District and the plaintiffs' attorneys were free to choose the venue best suited to their clients' interests.

VIII. *Conclusion.*

We vacate the district court's finding that the requirement of hospitalization for

---

**40.** It seems highly unlikely that a woman would forego a legal abortion for fear that in the event of complications she would have to tell a physician when and where she received the abortion.

**41.**

| | | | |
|---|---|---|---|
| Susman | 148 | hrs at $80/hr | $11,840.00 |
| Beran | 116.4 | hrs at $60/hr | 6,984.00 |
| Shurin | 7 | hrs at $65/hr | 455.00 |
| Expenses | | | 2,758.73 |
| Total | | | $22,037.73 |

second trimester abortions, under section 188.025, is unconstitutional. We remand this issue to the district court for further proceedings and findings as to whether the hospitalization requirement is a substantial burden on a woman's decision to have an abortion and, if so, whether the State has shown a compelling state interest which justifies the requirement.

We vacate the district court's finding that the provisions relating to parental or judicial consent contained in section 188.028 are unconstitutional in their entirety. Although we find the statute impermissibly requires notice to the parents of all minors, we find the judicial consent provision of the statute to be constitutional.

We reverse the district court's finding that section 188.030 of the Missouri statutes imposes strict criminal liability on doctors who abort viable fetuses. We find the Missouri law requires scienter (knowledge) by the physician such that it comports with constitutional requirements. We also reverse the district court's holding that subsection 188.030.2 is unconstitutionally vague.

Finally, we vacate the district court's holding sustaining the constitutionality of section 188.047, requiring pathology reports following all abortions. We find this requirement imposes an undue burden since there is no compelling state interest to justify it, at least in first trimester abortions.

We affirm the district court's finding that the requirement of a second doctor during an abortion of a viable unborn child pursuant to subsection 188.030.3 is unconstitutional. We likewise affirm the court's finding that a 48-hour waiting period as required by subsection 188.039.1 is unconstitutional.

We affirm the district court's finding that a portion of subsection 188.039.2 and all of subsections (1), (2), (3) and (4) thereunder are unconstitutional. These subsections require notice to parents of all minors and prescribe detailed information a doctor must give a woman seeking an abortion. The district court correctly upheld the right of the state to require the attending physi-

cian to inform the woman as to the particular medical risks associated with the abortion technique to be used and the available alternatives. We vacate the district court's finding that the state may require a physician to file post-abortion complication reports under section 188.052.2 and remand this provision for reconsideration in view of the argument made by the parties.

We affirm the award of attorneys' fees.

The cause is reversed in part and affirmed in part and remanded for further proceedings in accord with our directions. The district court should certify within 90 days its further findings regarding the constitutionality of sections 188.025 and 188.052.2. This court shall retain jurisdiction of this appeal until certification by the district court and further order of this court. Any petition for rehearing should be deferred until final judgment of this court; no mandate is to issue until final judgment is entered.

## APPENDIX

AN ACT to repeal sections 188.015, 188.020, 188.025, 188.030, 188.035, 188.050, 188.055, 188.060, and 188.075, RSMo 1978, relating to regulation of abortions, and to enact in lieu thereof fifteen new sections relating to the same subject, with penalty provisions and an emergency clause.

Be it enacted by the General Assembly of the State of Missouri, as follows:

Section 1. Sections 188.015, 188.020, 188.025, 188.030, 188.035, 188.050, 188.055, 188.060 and 188.075, RSMo 1978 are repealed and fifteen new sections enacted in lieu thereof, to be known as sections 188.015, 188.020, 188.025, 188.027, 188.028, 188.030, 188.035, 188.037, 188.039, 188.047, 188.052, 188.055, 188.060, 188.063 and 188.075, to read as follows:

188.015. Unless the language or context clearly indicates a different meaning is intended, the following words or phrases for the purposes of sections 188.010 to 188.085 shall be given the meaning ascribed to them:

(1) "Abortion", the intentional destruction of the life of an embryo or fetus in his or her mother's womb or the intentional termination of the pregnancy of a mother with an intention other than to increase the probability of a live birth or to remove a dead or dying unborn child;

(2) "Abortion facility", a clinic, physician's office, or any other place or facility in which abortions are performed other than a hospital;

(3) "Conception", the fertilization of the ovum of a female by the sperm of a male;

(4) "Physician", any person licensed to practice medicine in this state by the state board of registration of the healing arts;

(5) "Unborn child", the offspring of human beings from the moment of conception until birth and at every stage of its biological development, including the human conceptus, zygote, morula, blastocyst, embryo, and fetus;

(6) "Viability", that stage of fetal development when the life of the unborn child may be continued indefinitely outside the womb by natural or artificial life-supportive systems.

188.020. No person shall perform or induce an abortion except a physician.

188.025. Every abortion performed subsequent to the first twelve weeks of pregnancy shall be performed in a hospital.

188.027. No abortion shall be performed except with the prior, informed and written consent freely given of the pregnant woman.

188.028. 1. No person shall knowingly perform an abortion upon a pregnant woman under the age of eighteen years unless:

(1) The attending physician has secured the informed written consent of the minor and one parent or guardian; or

(2) The minor is emancipated and the attending physician has received the informed written consent of the minor; or

(3) The minor has been granted the right to self-consent to the abortion by court order pursuant to subsection 2 of this section, and the attending physician has received the informed written consent of the minor; or

(4) The minor has been granted consent to the abortion by court order, and the court has given its informed written consent in accordance with subsection 2 of this section, and the minor is having the abortion willingly, in compliance with subsection 3 of this section.

2. The right of a minor to self-consent to an abortion under subdivision (3) of subsection 1 of this section or court consent under subdivision (4) of subsection 1 of this section may be granted by a court pursuant to the following procedures:

(1) The minor or next friend shall make an application to the juvenile court which shall assist the minor or next friend in preparing the petition and notices required pursuant to this section. The minor or the next friend of the minor shall thereafter file a petition setting forth the initials of the minor; the age of the minor; the names and addresses of each parent, guardian, or, if the minor's parents are deceased and no guardian has been appointed, any other person standing in loco parentis of the minor; that the minor has been fully informed of the risks and consequences of the abortion; that the minor is of sound mind and has sufficient intellectual capacity to consent to the abortion; that, if the court does not grant the minor majority rights for the purpose of consent to the abortion, the court should find that the abortion is in the best interest of the minor and give judicial consent to the abortion; that the court should appoint a guardian ad litem of the child; and if the minor does not have private counsel, that the court should appoint counsel. The petition shall be signed by the minor or the next friend;

(2) Copies of the petition and a notice of the date, time, and place of the hearing shall be personally served upon each parent, guardian or, if the minor's parents are deceased and no guardian has been appointed, any other person standing in loco parentis of the minor listed in the petition by the sheriff or his deputy. If a parent or guard-

ian or, if the minor's parents are deceased and no guardian has been appointed, any other person standing in loco parentis cannot be personally served within two days after reasonable effort, the sheriff or his deputy shall give constructive notice to them by certified mail to their last known address and the hearing shall not be held for at least forty-eight hours from the time of the mailing. In any case where there exists the potential or appearance of conflict of interests between the parents or guardian or next friend of the child and the child, the court shall appoint a guardian ad litem to defend the minor's interests. The court shall set forth, for the record, the grounds for such appointment;

(3) A hearing on the merits of the petition, to be held on the record, shall be held as soon as possible within five days of the filing of the petition. If any party is unable to afford counsel, the court shall appoint counsel at least twenty-four hours before the time of the hearing. At the hearing, the court shall hear evidence relating to the emotional development, maturity, intellect and understanding of the minor; the nature, possible consequences, and alternatives to the abortion; and any other evidence that the court may find useful in determining whether the minor should be granted majority rights for the purpose of consenting to the abortion or whether the abortion is in the best interests of the minor;

(4) In the decree, the court shall for good cause:

(a) Grant the petition for majority rights for the purpose of consenting to the abortion; or

(b) Find the abortion to be in the best interests of the minor and give judicial consent to the abortion, setting forth the grounds for so finding; or

(c) Deny the petition, setting forth the grounds on which the petition is denied;

(5) If the petition is allowed, the informed consent of the minor, pursuant to a court grant of majority rights, or the judicial consent, shall bar an action by the parents or guardian of the minor on the grounds of battery of the minor by those performing the abortion. The immunity granted shall only extend to the performance of the abortion in accordance herewith and any necessary accompanying services which are performed in a competent manner. The costs of the action shall be borne by the parties.

(6) An appeal from an order issued under the provisions of this section may be taken to the court of appeals of this state by the minor or by a parent or guardian of the minor. The notice of intent to appeal shall be given within twenty-four hours from the date of issuance of the order. The record on appeal shall be completed and the appeal shall be perfected within five days from the filing of notice to appeal. Because time may be of the essence regarding the performance of the abortion, the supreme court of this state shall, by court rule, provide for expedited appellate review of cases appealed under this section.

3. If a minor desires an abortion, then she shall be orally informed of and, if possible, sign the written consent required by section 188.039 in the same manner as an adult person. No abortion shall be performed on any minor against her will, except that an abortion may be performed against the will of a minor pursuant to a court order described in subdivision (4) of subsection 1 of this section that the abortion is necessary to preserve the life of the minor.

188.030. 1. No abortion of a viable unborn child shall be performed unless necessary to preserve the life or health of the woman. Before a physician may perform an abortion upon a pregnant woman after such time as her unborn child has become viable, such physician shall first certify in writing that the abortion is necessary to preserve the life or health of the woman and shall further certify in writing the medical indications for such abortion and the probable health consequences.

2. Any physician who performs an abortion upon a woman carrying a viable unborn child shall utilize the available method

or technique of abortion most likely to preserve the life and health of the unborn child. In cases where the method or technique of abortion which would most likely preserve the life and health of the unborn child would present a greater risk to the life and health of the woman than another available method or technique, the physician may utilize such other method or technique. In all cases where the physician performs an abortion upon a viable unborn child, the physician shall certify in writing the available method or techniques considered and the reasons for choosing the method or technique employed.

3. An abortion of a viable unborn child shall be performed or induced only when there is in attendance a physician other than the physician performing or inducing the abortion who shall take control of and provide immediate medical care for a child born as a result of the abortion. During the performance of the abortion, the physician performing it, and subsequent to the abortion, the physician required by this section to be in attendance, shall take all reasonable steps in keeping with good medical practice, consistent with the procedure used, to preserve the life and health of the viable unborn child; provided that it does not pose an increased risk to the life or health of the woman.

188.035. Whoever, with intent to do so, shall take the life of a child aborted alive, shall be guilty of murder of the second degree.

188.037. No person shall use any fetus or child aborted alive for any type of scientific, research, laboratory or other kind of experimentation either prior to or subsequent to any abortion procedure except as necessary to protect or preserve the life and health of such fetus or child aborted alive.

188.039. 1. No physician shall perform an abortion unless, prior to such abortion, the physician certifies in writing that the woman gave her informed consent, freely and without coercion, after the attending physician had informed her of the information contained in subsection 2 of this section not less than forty-eight hours prior to her consent to the abortion, and shall further certify in writing the pregnant woman's age, based upon proof of age offered by her.

2. In order to insure that the consent for an abortion is truly informed consent, no abortion shall be performed or induced upon a pregnant woman unless she has signed a consent form that shall be supplied by the state division of health, acknowledging that she and, if she is a minor, her parent or legal guardian or person standing in loco parentis have been informed by the attending physician of the following facts:

(1) That according to the best medical judgment of her attending physician she is pregnant;

(2) The number of weeks elapsed from the probable time of conception of her unborn child, based upon the information provided by her as to the time of her last menstrual period and after a history and physical examination and appropriate laboratory tests;

(3) The probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed;

(4) The immediate and long-term physical dangers of abortion and psychological trauma resulting from abortion and any increased incidence of premature births, tubal pregnancies and still births following abortion;

(5) The particular risks associated with the abortion technique to be used;

(6) Alternatives to abortion shall be given by the attending physician, including a list of public and private agencies and services that will assist her during her pregnancy and after the birth of her child.

3. The physician may inform the woman of any other material facts or opinions, or provide any explanation of the above information which, in the exercise of his best medical judgment, is reasonably necessary to allow the woman to give her informed consent to the proposed abortion, with full knowledge of its nature and consequences.

188.047. A representative sample of tissue removed at the time of abortion shall be submitted to board eligible or certified pathologist, who shall file a copy of the tissue report with the state division of health, and who shall provide a copy of the report to the abortion facility or hospital in which the abortion was performed or induced and the pathologist's report shall be made a part of the patient's permanent record.

188.052. 1. An individual abortion report for each abortion performed or induced upon a woman shall be completed by her attending physician.

2. An individual complication report for any post-abortion care performed upon a woman shall be completed by the physician providing such post-abortion care. This report shall include:

(1) The date of the abortion;

(2) The name and address of the abortion facility or hospital where the abortion was performed;

(3) The nature of the abortion complication diagnosed or treated.

3. All abortion reports shall be signed by the attending physician, and submitted to the state division of health within forty-five days from the date of the abortion. All complication reports shall be signed by the physician providing the post-abortion care and submitted to the division of health within forty-five days from the date of the post-abortion care.

4. A copy of the abortion report shall be made a part of the medical record of the patient of the facility or hospital in which the abortion was performed.

5. The state division of health shall be responsible for collecting all abortion reports and complication reports and collating and evaluating all data gathered therefrom and shall annually publish a statistical report based on such data from abortions performed in the previous calendar year.

188.055. 1. Every abortion facility, hospital, and physician shall be supplied with forms by the division of health for use in regards to the consents and reports required by sections 188.010 to 188.085. A purpose and function of such consents and reports shall be the preservation of maternal health and life by adding to the sum of medical knowledge through the compilation of relevant maternal health and life data and to monitor all abortions performed to assure that they are done only under and in accordance with the provisions of the law.

2. All information obtained by physician, hospital, or abortion facility from a patient for the purpose of preparing reports to the division of health under sections 188.010 to 188.085 or reports received by the division of health shall be confidential and shall be used only for statistical purposes. Such records, however, may be inspected and health data acquired by local, state, or national public health officers.

188.060. All medical records, reports, and other documents required to be kept under sections 188.010 to 188.085 shall be maintained in the permanent files of the abortion facility or hospital in which the abortion was performed for a period of seven years.

188.063. No abortion facility shall advertise or hold itself out as also providing counseling to pregnant women unless:

(1) The counseling is done by a licensed physician, registered nurse or other person holding at least a bachelor's degree from an accredited college or university in psychology or appropriate field or having completed special training in counseling;

(2) The counseling includes factual information given in such a manner as to not be misleading, including explicit discussion of the development of the unborn child; and

(3) The counseling includes a thorough discussion of alternatives to abortion and availability of agencies and services to assist her if she chooses to carry her child to term.

2. The prescribed course of study which shall constitute special training in counseling shall be promulgated by the division of health. Any rule or portion of a rule promulgated pursuant to this chapter may be suspended by the joint committee on admin-

istrative rules if after hearing thereon the committee finds that such rule or portion of the rule is beyond or contrary to the statutory authority of the agency which promulgated the rule, or is inconsistent with the legislative intent of the authorizing statute. The general assembly may reinstate such rule by concurrent resolution signed by the governor.

188.075. Any person who contrary to the provisions of sections 188.010 to 188.085 knowingly performs or aids in the performance of any abortion or knowingly fails to perform any action required by sections 188.010 to 188.085 shall be guilty of a class A misdemeanor and, upon conviction, shall be punished as provided by law.

Section A. Because of the necessity for immediate state action to regulate abortions to protect the lives and health of citizens of this state, this act is deemed necessary for the immediate preservation of the public health, welfare, peace and safety, and is hereby declared to be an emergency act within the meaning of the constitution, and this act shall be in full force and effect upon its passage and approval.